**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

 AFAM UWZUOKO,

                         **Plaintiff,**

             vs.                                    **10-cv-4960 (RA)**

 **CITY OF NEW YORK, MICHELLE**
 **KRAWIEKI AND CARL MILUSO,**

                         **Defendants**
-----------------------------------------------------------------

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**(RENEWED) MOTION UNDER RULE 50 FOR ADDITIONAL RELIEF**

| | | |
|---|---|---|
| Daniela Nanau, Esq.<br>Law Offices of Daniela Nanau, PC<br>*Attorney for Plaintiff*<br>89-03 Rutledge Avenue<br>Glendale, NY 11385<br>(888) 404-4975 | | Gregory Antollino, Esq.,<br>*Attorney for Plaintiff*<br>275 Seventh Avenue Suite 705<br>New York, NY 10001<br>(212) 334-7397 |

                                        June 9, 2016

## TABLE OF CONTENTS

**Preliminary statement & summary of argument**........................................................................iii

**STANDARD OF REVIEW** ................................................................................................... **4**

**ARGUMENT** ............................................................................................................................ **5**

    **I.    No Probable Cause to Arrest for Any Park Violation, Even Alleged Rule Prohibiting "Adults in the Park Without Children"** .............................................................................. **5**

        A.   Hunch upon hunch upon hunch does not amount to probable cause ............................ 5

        B.   There is no rule prohibiting parents without children in this park that happens to be called a "Playground." ................................................................................................. 11

        C.   The remaining Park Rules invoked pertain to the following points. .......................... 14

    **II.   There Was No Probable Cause to Arrest Plaintiff for Disorderly Conduct** ......................... **14**

    **III.  There wasn't a shred of evidence that plaintiff obstructed anything, let alone government administration, unless you deprive him of his Fifth Amendment Right, which the Circuit held was improper.** ........................................................................................................ **21**

    **IV.  If there are questions of fact or law supporting some laws argued but not others, a new trial is required – including damages.** ................................................................................ **23**

    **V.   There are no facts in dispute that would allow the defense of qualified immunity** .............. **24**

    **VI.  The Court has the discretion to order a new trial, in weight of the evidence.** ....................... **24**

    **CONCLUSION** ..................................................................................................................... **26**

# TABLE OF AUTHORITIES

<u>Cases</u>

*Arizona v. Johnson*, 555 U.S. 323 (2009). ...................................................................... 11

*United States v. Bayless,* 201 F.3d 116 (2d Cir. 2000). .................................................. 11

*Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) ............................................................ 26

*Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010). ............................................ 22

*Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228 (2d Cir. 1991) ................... 27

*Cross v. N.Y. City Transit Auth.*, 417 F.3d 241 (2d Cir. 2005) ......................................... 6

*Florida v. Royer*, 460 U.S. 491 (1983) ............................................................................. 4

*Florida v. Royer*, 460 U.S. 491 (1983) ........................................................................... 12

*Gordon v. N.Y.C. BOE.*, 232 F.3d 111 (2d Cir. 2000). .............................................. 21, 26

*Houston v. Hill*, 482 U.S. 451 (1987) .............................................................................. 21

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ................................................................... 11, 12

*Navarette v. California*, 134 S. Ct. 1683 (2014)............................................................. 11

*Norwell v. Cincinnati*, 414 U.S. 14 (1973) ..................................................................... 21

*Ohio v. Reiner*, 532 U.S. 17 (2001) ................................................................................. 4

*Pahuta v. Massey-Ferguson, Inc.*, 60 F. Supp. 2d 74 (W.D.N.Y. 1999) ......................... 6

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003)............................................................... 22

*People v. Baker*, 20 N.Y.3d 354 (2013)........................................................................... 20

*People v. Battiste*, 2015 NY Slip Op 50881(U) (App. Term 2015)................................. 14

*People v. Case*, 42 N.Y.2d 98 (1977) .............................................................................. 23

*People v. Howard*, 50 N.Y.2d 583 (1980) ................................................................................ 12

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000) .............................................. 6

*Rubin v. United States*, 525 U.S. 990 (1998) ............................................................................ 4

*Rucks v. City of N.Y.*, 96 F. Supp. 3d 138 (S.D.N.Y. 2015) .................................................... 25

*Sanders v. New York City Human Res. Admin.*, 361 F.3d 749 (2d Cir. 2004) ............................ 26

*Simpson v. City of New York*, 793 F.3d 259 (2d Cir. 2015) ........................................................ 11

*Song v. Ives Labs., Inc.*, 957 F.2d 1041 (2d Cir. 1992) .............................................................. 26

*Terry v. Ohio*, 392 U.S. 1 (1968) ...................................................................................... 10, 11

*United States v. Arvizu,* 534 U.S. 266 (2002) .......................................................................... 11

*United States v. Bailey*, 743 F.3d 322 (2d Cir. 2014) .......................................................... 10, 11

*United States v. Espino-Urvan*, 2013 U.S. Dist. LEXIS 73809 (S.D.N.Y. May 21, 2013).......... 10

*United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013) .............................................................. 12

*United States v. Padilla*, 548 F.3d 179 (2d Cir. 2009).......................................................... 11, 12

*United States v. Valenzuela*, 365 F.3d 892 (10th Cir. 2004). .................................................... 10

*Uzoukwu v. City of N.Y.*, 805 F.3d 409 (2d Cir. 2015) .................................................... 5, 23, 24

<u>Statutes</u>

Fed. R. Civ. P. 50 ...................................................................................................................... 5

Fed. R. Civ. P. 59. ................................................................................................................... 26

New York Penal Law § 155.25 .................................................................................................. 4

New York Penal Law § 140.30(3). ............................................................................................. 4

New York Penal Law § 155.25 .................................................................................................. 4

New York Penal Law § 195.05 ................................................................................................. 23

New York Penal Law Section 155.25 ........................................................................................... 4

New York Penal Law§ 195.05 ................................................................................................... 22

Other Authorities

"From Making the Cases to Challenging Them," New York Times, May 2, 2008 ..................... 27

Constitutional Provisions

Fifth Amendment ......................................................................................... 3, 4, 22, 28

First Amendment ...................................................................................... 3, 26, 27, 28

## PRELIMINARY STATEMENT & SUMMARY OF ARGUMENT

Americans, have the constitutional right to remain silent, even in the face of questions from a police officer. Defendants in this case believe otherwise. Although perhaps it's true that the average person would answer the questions of a uniformed police officer, it is beyond quibble, according to the highest document in the Land that we all have this right. No one may make an adverse inference from invocation of that right – not juries, not police officers, and, as last line of defense, the Courts must actively refrain from doing so to preserve and enforce Constitution rights. The Second Circuit said so, in the context of this case, yet the Defendants predicate most, if not all of their contentions of probable cause – bootstrapped by immigration testimony not available to the defendants at the time of arrest – on Plaintiff's rare, yet protected, invocation of his right to remain silent when questioned by the police.

Most Americans in Plaintiff's situation would be scared if confronted as Uzoukwu was by the Defendants in the aggressive manner in which they approached him, and they would answer the officers' questions. But that is not the point. The point is that a person has the Constitutionally protected right to be left alone and not to answer a police officer. A failure to do so can lead to <u>no</u> adverse inference, let alone bootstrap probable cause. The Defendants argued in this case that they were so stumped by Plaintiff's protestations and called their supervisor. But why? Defendant Krawiecki admitted they were taught the Constitution at the academy that a person may lawfully defy the police by remaining silent. Yet in this case, Defendants arrested Uzoukwu because he exercised his constitutional rights to remain silent and because he protested being singled out, in defiance of their questionable policing. Plaintiff's invocation of his rights was something expressly authorized by the Constitution as a check on the police power of the

1

state. In light of the jury's problematic verdict in this case – including their question about a non-sensical law that benches in a park called a "playground" are off limits to adults – Plaintiff now respectfully moves the Court and requests that it protect the Constitution in accordance with the backing of the Supreme Court. To do otherwise is to condone a reading a cotton-candy version of the Constitution that affords no protection from unlawful policing. Do the rights afforded in our Constitution depend on the context, as Defendants informed the jury at trial, or does the Constitution's protections allow a person to remain silent in the face of the police at any time? Or must citizens doing nothing but sitting, eating Jell-o in a park, not bothering anyone else, kowtow to an officer's whim and answer questions or suffer arrest?

It is important that the Court not endorse Defendants' position in this litigation, which encourages a reading of the Constitution that corrodes the breadth of our First and Fifth Amendment rights. What most Americans would do in the face of police misconduct does not define the boundaries of the United States Constitution. Officer Krawiecki was angry with Plaintiff because he was not responsive to her questions are she demanded, and knocked over his Jell-O, which is a crime of petty larceny, *see* New York Penal Law § 155.25; or malicious mischief, Penal Law § 155.25; or second degree harassment, Penal Law § 140.30(3). She admitted to committing these crimes because Plaintiff exercised his constitutional rights. If the Court is going to allow a police officer to commit crimes in order to upend a person's exercise of his constitutional right to remain silent, when there was no probable cause for the commission of any crime, then the day has come when the Bill of Rights means nothing.[1]

---

[1]  The Fifth Amendment protects both the innocent and the guilty. One of the amendment's "basic functions . . . is to protect innocent [people] . . . who otherwise might be ensnared by ambiguous circumstances." *Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (citations

Before defendants approached Plaintiff on May 15, 2008, he, through his conduct, demonstrated that he didn't want any contact with the police. He was sitting on a bench, quietly eating Jell-O in the park, not bothering anyone. That's not a crime, nor susceptible of any interpretation of a crime. Although not a contention in this case, an officer in that situation might not have a right of common-law inquiry if someone is just sitting on a bench in the park. But assuming tithe officer had such a right - and certainly no more on thee facts - even if the citizen being questioned chooses not to answer, it does not increase the evidence of probable cause. Defendants disagree with this basic premise, which demonstrates what is at stake in this case: a test of the boundaries of the Constitution, to which you sit as guardian.

For all of the reasons articulated herein, the Court should hold, based on established constitutional principles, that the evidence proffered to the jury at trial demonstrates, as a matter of law, that the Defendants abused their positions of authority and arrested Plaintiff with probable cause for nothing in violation of his rights. Accordingly, Plaintiff moves under Rule 50(b) for judgment as a matter of law that there was no probable cause for any crime alleged. He moves to strike the affirmative defenses and have a trial on damages. If, in the alternative, the Court finds that there is no probable cause for a *single* crime that the Defendants relied upon,

---

omitted) . In *Florida v. Royer*, 460 U.S. 491 (1983), the Supreme Court "held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Id*., at 498. "And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Id. As Justice Breyer pointed out, there are practical reasons for this: the complexity of the law, codified in several thousand sections of the United States Code and New York State Penal Law provides a potentially infinite "variety of factual circumstances that might trigger an investigation into a possible violation of the law, make it difficult for anyone to know, in advance, just when a particular set of statements might later appear (to a prosecutor) to be relevant to some such investigation." *Rubin v. United States*, 525 U.S. 990, 993 (1998) (Breyer, J. dissenting from denial of certiorari).

because it was a general verdict, the Court must give Plaintiff a new trial on liability. As the Second Circuit opined: "Nor can the issue of whether probable cause existed to arrest for disorderly conduct be decided as a matter of law. The parties presented radically different views of the events leading up to Uzoukwu's arrest." *Uzoukwu v. City of N.Y.*, 805 F.3d 409, 418 (2d Cir. 2015) (noting Plaintiff's neck surgery).

## STANDARD OF REVIEW

To succeed on a Rule 50 motion, a movant must show that, after full hearing on an issue at trial, "there is no legally sufficient evidentiary basis for a reasonable jury" to resolve the issue in favor of the non-moving party. Fed. R. Civ. P. 50(a)(1). In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *accord Cross v. N.Y. City Transit Auth.,* 417 F.3d 241, 247 (2d Cir. 2005). In making this Motion, Plaintiff relies only on the testimony Defendants' proffered to the jury, the stipulations agreed to by the parties at trial, and facts that the Court took judicial notice of at trial.

The Court may also *sua sponte* grant a new trial based on issues that can lead to reversal on appeal, such as the decision to bifurcate the trial into liability and damages phases, when the Second Circuit found the doctor's evidence presented an issue of fact that denied summary judgment, whereas the Circuit's mandate required a new trial. *See Pahuta v. Massey-Ferguson, Inc.,* 60 F. Supp. 2d 74, 77 (W.D.N.Y. 1999) ( by vacating the judgment and remanding for a new trial, that included the evidence on damages, which were intertwined with liability and a basis upon which the Circuit reversed). A liability only trial, that added all of this post-hoc

information that the officer did not possess at the time of the arrest, in our belief, violated the mandate. Id. Thus the decision to allow in extensive testimony regarding the immigration status of Plaintiff and his children may also provide a basis for a sound appeal.

## **ARGUMENT**

I.   **No Probable Cause to Arrest for Any Park Violation, Even Alleged Rule Prohibiting "Adults in the Park Without Children"**

    A.   **Hunch upon hunch upon hunch does not amount to probable cause**

Defendants' self-serving position regarding Plaintiff's alleged violation of a park rule was premised on the illogical notion that there is a rule promulgated and enforced by the City of New York that prohibits any adult from stepping foot unto a plot of City-owned land unless accompanied by a child where such plot of land happens to be entitled "playground" rather than "park." Defendants, who are current employees of the City of New York, proffered to the jury no evidence other than their own self-serving testimony in support of there position, and even admitted that their interpretation of the rule was based on their own "common sense" and not training afforded to them by the City of New York or even other signs regarding rules at the Dutch Kills Playground. *See*   In addition, Defendant Krawiecki admitted that the rule prohibiting adults without children only applied to certain sections of the Dutch Kills Playground, not the entire park, which further suggests that Defendants' interpretation of the rule and their defense premised on Plaintiff's alleged violation of the rule is baseless and unreasonable:

    Q.   Now, do you think that the sign that pertains to children in the park applies to every single aspect of the park?

    A.   I don't know.

5

Q.      Well, what about someone who wants to play basketball?

A.      What are you asking me?

Q.      Does someone who wants to play basketball have to come in with a kid?

A.      I only focused my attention on the area where the young children would be. Krawiecki; 251; 5-14.

Nonetheless, for the purposes of the instant Motion, let us assume that Defendants' otherwise indefensible position regarding the breadth of the rule and the propriety of their enforcement of it at the Dutch Kills Playground is not in question.

In order to successfully demonstrate she had reasonable suspicion that Plaintiff had violated this park rule, Defendant Krawiecki needed to articulate what specific observations led her to conclude that criminal activity was afoot, which she failed to do at trial. While she may have the common law right of inquiry to approach Plaintiff while he was eating his Jell-o, nothing in her testimony or the testimony of her former partner, Defendant Miluso, demonstrated that Plaintiff did anything beyond ignore Defendants when they first approached him and then protest their questionable policing:

Q.      Now, I'm getting back to where I was before we went on to this tangent, and I said you're taught to de-escalate confrontations with citizens.

And you said that that's only the case when there isn't a crime. But at that point, Afam was simply sitting and not responding to you; correct?

A.      He also did not have children with him.

Q.      You didn't know whether he had children in the park or not, did you?

MR. FARRELL:    Objection.

THE COURT:    Overruled.

6

THE WITNESS:    After my observation and investigation, I came to the conclusion that he did not have children in that park.

BY MR. ANTOLLINO:

Q.    And your investigation was that you saw him sitting there looking down and eating jello with no diapers or strollers; correct?

A.    Correct.

Q.    And no further investigation led you to the conclusion that he was in violation of a park rule; correct?

A.    No.   We asked him several times if he had children with him.   He would not acknowledge us.

Q.    But you agreed with me before that he has a right not to answer you.   Correct?

A.    If he's violating a rule and he doesn't answer -- we're trying to investigate.   We're asking him -- we're doing our investigation, asking him if he has children in the park. We
get no response.   He doesn't acknowledge us whatsoever.

Q.    But he had the right not to acknowledge you; correct?

A    Yes.

*        *        *

Q.    Your conclusion was that he did not have any children, one, because there were no children near him.   Correct?   That was one reason; correct?

A.    Yes.

Q.   But earlier, you said that the children don't need to be near him because they can be at the playground; correct?

MR. FARRELL:   Objection.

THE COURT:    I'm going to allow that.

THE WITNESS:    They could be at the playground.

BY MR. ANTOLLINO:

7

Q.      So your other two reasons for concluding that he didn't have any children at the park was that he didn't have a stroller; correct?

A.      That was one of them.

Q.      And not all children are in strollers; correct?

A.      Correct.

Q.      So that doesn't prove that he didn't have any children in the park; correct?

A.      Correct.

Q.      And the final reason is that he didn't have any diapers with him.    But not all children wear diapers; correct?

A.      That is not the final reason.

Q.      I understand. It's not the final reason. We'll go through more reasons, and we'll go through your questions. But another reason is that he didn't have any diapers with him. Is that right?

A.      That was one of the observations that I made.

Q.      That was one of the observations you made. But that's completely consistent with innocence. A person doesn't have to into that park with diapers next to him, does he?

A.      No.

Q.      Okay.   Aside from your questioning of him and the other things we mentioned, was there anything else that told you that he didn't have children in the park?

A.      He was looking down, not looking up whatsoever.

Q.      Okay. But you would agree that looking down is not a crime; correct?

A.      It's not a crime.

Krawiecki, 240; 4-243; 9.

By testifying in this manner, Defendant Krawiecki articulated no basis to support a finding of reasonable suspicion or probable cause that Plaintiff had engaged in any misconduct.

8

Instead, she noted a number of things she observed about Plaintiff before placing him under arrest, which were all consistent with innocence, as Defendant Krawiecki admitted. It is well-recognized that "probable cause cannot be based upon simply by piling hunch upon hunch." *United States v. Espino-Urvan*, 2013 U.S. Dist. LEXIS 73809, at *20 (S.D.N.Y. May 21, 2013) (citing *United States v. Valenzuela*, 365 F.3d 892, 897-98 (10th Cir. 2004)).

Similarly in *Terry v. Ohio*, the U.S. Supreme Court "expressly recognized that government interests in 'effective crime prevention and detection,' as well as in officer and public safety while pursuing criminal investigations, could make it constitutionally reasonable 'in appropriate circumstances and in an appropriate manner' temporarily to detain a person" to investigate possible criminality even in the absence of a warrant or probable cause for arrest. *United States v. Bailey*, 743 F.3d 322, 331-32 (2d Cir. 2014) (quoting *Terry*, 392 U.S. 1, 22-25 (1968)). To justify a *Terry* stop, there must be "a reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009)). This standard also requires more than a "hunch." *Terry v. Ohio*, 392 U.S. at 27. It demands "specific and articulable facts which, taken together with rational inferences from those facts," *id.* at 21, provide detaining officers with a "particularized and objective basis for suspecting legal wrongdoing," *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (internal quotation marks omitted). "Conduct that is as consistent with innocence as with guilt may form the basis for an investigative stop where there is <u>some</u> indication of possible illicit activity." *United States v. Padilla*, 548 F.3d at 187 (internal quotation marks omitted); *see Navarette v. California*, 134 S. Ct. 1683, 1691, 188 L. Ed. 2d 680 (2014). However, an indication of possible illicit activity is properly informed by "commonsense judgments and

inferences about human behavior." *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). In applying this standard, a reviewing court cannot merely defer to police officers' belief in assessing reasonable suspicion. The court must view the totality of the circumstances[2] through the eyes of a reasonable, cautious police officer on the scene – one who is cautious not only in enforcing laws but in protecting innocent citizens. *See United States v. Bailey*, 743 F.3d at 332; *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

However, as in this case, when "an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. And any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *United States v. Freeman*, 735 F.3d 92, 102 (2d Cir. 2013) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (internal quotation marks and citation omitted)); *accord Florida v. Royer*, 460 U.S. 491, 498 (1983) (held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business; any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure"). The cases in New York are no different. In *People v. Howard*, 50 N.Y.2d 583, 586 (1980), the Court of Appeals held that "[a]n individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away.

---

[2]  Importantly, none of information solicited by Defendants at trial regarding the immigration status of Plaintiff or his children, or how the children traveled to New York from Nigeria in 2008, obtained from Plaintiff, himself as well as other third-parties, can factor into the Court's analysis here. When determining whether probable cause existed to support an arrest, the Second Circuit has directed trial courts to "'consider those facts available to the officer *at the time of arrest and immediately before it*.'" *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015). (emphasis added). Additional information supplied years later from an immigration database does not change what Krawieki knew at the time, and no limiting instruction could possibly have changed that in a case where the central question was "What did defendants know at the time to justify probable case?

Though the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away.") (while the police had a basis to question defendant because he was in a high-crime area, was carrying a vanity case that might have enclosed illegal items and had repeatedly glanced at the police car, defendant had the right to ignore those inquiries and run away).

Although Defendant Krawiecki needed a "particularized and objective basis for suspecting that Plaintiff was engaged in legal wrongdoing," *Arvizu*, 534 U.S. at 273, she testified that Uzoukwu violated the park rule based on the "inchoate and unparticularized suspicion or "hunch" that the Fourth Amendment strictly prohibits. *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2009). Accordingly, Defendants failed to demonstrate a *prima facie* violation of the park rule prohibiting adults from being at the Dutch Kills Playground without children (or any other park rule).

## B. There is no rule prohibiting parents without children in this park that happens to be called a "Playground."

The Court denied our request to instruct the jury on the powers of the commissioner, and only took judicial notice of pone regulation. However, that one regulation defined park rules. The park is called a playground, but evidence showed it had a long history of use by everyone in the community of all ages, and the arbitrary enforcement of an adult's being in one part of the park versus another – with no defined guidance – is the quintessential example of dictatorship. Common sense dictates that the sign applied to the children's area, not the bench area, and as

Krawiecki admitted, not the basketball area. It's all or nothing under the defense interpretation – which they go on to say has exceptions, whose boundaries we don't know. The jury was confused about this. Having overruled our objection to instruct on the Park Regulations 105-s, we were in a weird situation wherein the jury decides as a matter fact as to the counters of the law. The jury can only interpret facts, so I joined you in that response to the question, but consider how absurd: The jury deciding what the law says. It was your obligation to instruct them with precision. We don't believe there was probable cause to arrest for the reasons stated above, but even if there were probable cause to believe plaintiff had no children anywhere in the park, this law being enforced does not exist. I personally have been to that park several times and seen adults sitting in the shaded bench area. Yes, plaintiff sat on the first bench within that area next to a swing set, but he was still within the bench area, not the swings area. The racquetball/handball court is open to the swing area, and the idea that the gate is there for any reason other than to keep balls in the Court is fanciful thinking. A man eating Jell-O in a non-playground area of the park is not committing a crime. As I pointed out before the verdict, the one case the looked at this "crime" of an adults in the park without children was reversed *on the facts* where a man was sitting in a separate section from the playground area. *People v. Battiste*, 2015 NY Slip Op 50881(U) (App. Term 2015). So *Battiste* was not a new interpretation of law; it was a rejection as a matter of fact that a person commits a park violation by sitting near a children's playground.

It's embarrassing that in this country we had a trial that was 75% about whether a man, sitting in a non-children's area of the park, committed a park violation because he was not looking around and had no diapers or – as was added in summation – a backpack. People cannot

possibly, under any reasonable interpretation of reality, get arrested for such conduct, nor should

the police think, with any common sense, that such a scenario is indicative of a crime. Plaintiff

was told to leave the park only if he *did not* have children. That lends credence to an inference

only that, since he didn't leave, that he was privileged to be there. But it was his failure to

respond that Krawieki didn't like, and that was a violation of plaintiff's right to remain silent.[3]

---

[3]      Krawieki attested at some point that plaintiff was focused on his Jell-O and not "looking around."
It would seem to me that a single man "looking around" at kids in the park could also be evidence that he
was scoping the place out for victims. That plaintiff was looking at Jell-O and not at his surroundings is
indicative of nothing whatsoever. It's a neutral because not only does it make sense that a person eating
food looks at the food he is picking up with a utensil, but any looking around could support either that he
was looking for his children *or* that he was searching for potential victims. It is not a factor upon which to
place probable cause that one does not have children. Parenting skills are not universal and not evidence
of criminal activity being afoot.

### C.     The remaining Park Rules invoked pertain to the following points.

There were three rules argued to the jury: the so called "Adult in the Park" rule; disorderly conduct; and Obstruction of Governmental Administration. The additional park rules invoked were merely duplicative of the others, with perhaps the exception of "failure to follow a lawful order," which of course turns on the question of the legality of the order and what is discussed above and below.

## II.     There Was No Probable Cause to Arrest Plaintiff for Disorderly Conduct

The Court correctly instructed the jury on the Disorderly Conduct statute as follows:

> A person is guilty of Disorderly Conduct when: with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
> 1. He engages in fighting or in violent, tumultuous or threatening behavior; or
> 2. He makes unreasonable noise; or
> 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture[.]

*See* Jury Charge. However, at trial, Defendants presented no shred of evidence that demonstrated or even suggested that Plaintiff's alleged misconduct was actually directed towards the public as it must for a *prima facie* violation of Disorderly Conduct to be made out under the statute.

Indeed, Defendant Miluso admitted that Plaintiff's alleged disorderly conduct occurred when Plaintiff protested Defendant Krawiecki's misconduct when she grabbed Plaintiff's Jell-o from his hands and by threw it in the garbage without his permission. *See* Miluso, p.88, lns. 2-12[4]. Defendant Miluso admitted that the resulting "scene," which erupted after Defendant

---

[4]     Q.   Because you and Officer Krawiecki were no longer communicating effectively with
Mr. Uzoukwu.   Is that fair?
A.   I would say that communication wasn't where we would like it to be.

Krawiecki's prevocational conduct prompted Uzoukwu's protestations, and that the "scene" involved Miluso, his partner, and the Plaintiff::

Q.      There was a scene; correct?

A.      Yes.

Q.      And it involved you, Officer Krawiecki, and Mr. Uzoukwu; correct?

A.      Correct.

Q.      But you have no idea whether or not these folks were moving away, that   you   observed, because of your conduct or Mr. Uzoukwu's conduct;           correct?

A.      I mean, I assume that they were moving because he was screaming,           yelling,   and cursing and throwing his arms up in the air.

Q.      I guess I'm wondering: What is that assumption based on? Did someone     tell   you   that, sir?

A.      No.   He's screaming and cursing in a playground with kids around, and     people were dispersing from that immediate area where they were either     sitting   or   moving   or walking past.

Q.      *There were also two police officers confronting someone who was  protesting their conduct; correct?*

A.      *Yes.*

Q.      *You've agreed with me that that was going on; correct?*

A.      *Uh-huh.*

---

        Q.    You weren't communicating with him.   Officer Krawiecki had grabbed his jello.     That's not communication; correct?   Is that correct, Officer Miluso?
        A.    That's not a type of communication[.]
        Q.    That's escalating the situation; correct?
        A.    At that moment, I cannot speak for why she did that.   But it grabbed his attention.
Miluso, p. 88, lns 2-12.

Q.    *So that was part of the scene that they were moving away from; correct?*

A.    *Yes.*

Miluso, p. 93, ln 23- p. 94, ln 21 (emphasis added).

*      *      *

Q.    Now, Officer Krawiecki not only, to use your words," removed "the jello from Mr. Uzoukwu's hands, she threw it in the garbage; correct?

A.    I don't remember what she did with it.

Q.    You don't recall, sir.

A.    I might have -- I don't know.

Q.    But you do recall that it was at that moment that the situation escalated; correct?

A.    Yes.

Miluso, 175, 25-176, 8.

Defendant Krawiecki's conclusory testimony regarding the basis for the Disorderly Conduct charge also fails to support a *prima facie* case.   In the following, Krawiecki testifies that Uzoukwu was arrested for "disorderly conduct," but that his alleged misconduct was aimed at her, in response for her unauthorized removal and disposal of his Jell-o:

Q.   So your answer to get to him was to throw the jello in the garbage.   That's not de-escalating the situation, is it?

A.   We could have arrested him at this point.   We tried to give him the opportunity to speak with us, and I knew that the only way to get his attention at that point was to take away the jello that he was continuing to eat while we were trying to talk to him.

Q.   You could have arrested him at this point on what basis?

A.   Being in the park without his children.

16

Q.   But you admitted you didn't know if he was in the park without children.

MR. FARRELL:   No.

THE WITNESS:   No.   Based on all of the circumstances, he did not have children in that park.

BY MR. ANTOLLINO:

Q.   Based on all of the circumstances, he did not have children in that park?

A.   That's correct.

Q.   And you could have arrested him, but you never even charged him with not having children in the park.   Correct?

A.   *It is because he escalated the situation.    That is why I arrested him.*

Q.   He didn't escalate the situation.    You knocked over the jello.

     ***

Q.   He did not escalate the situation.    You escalated the situation; correct?

A.   That is not correct.

Q.   So you disagree that throwing out his jello was escalating the situation.

A.   It was not intended to escalate the situation.    It was intended for him to speak with us.
248– 249:2.

                        *      *      *

Q.   Now, when you threw Afam's jello into the garbage, he got up.    And he was mad at you; correct?

A.   Yes.   He was screaming and cursing in the middle of the playground.

Q.   He was screaming and cursing at you; correct?

A.   [At a] fully uniformed police officer in the middle of the playground.

Q.   He didn't go to anyone else nearby and scream and curse at anyone.    He was telling you off because he was angry at you; correct?

17

A.   I don't know what he was doing prior to when I got there.

Q.   Well, I didn't ask you about what he was doing before you got there of course.   But he wasn't screaming at any individual while you were there.   He was just screaming at you; correct?

A.   While I was there, yes.

255; 9-23.

Although Defendants tried to suggest to the jury, through their conclusory statements about people in the park allegedly walking away and were "alarmed" by Uzoukwu's conduct - which Plaintiff fervently disputes, especially given the state of his health at the time of the incident and the fact that he was recovering from the surgery that *Defendants stipulated he had done weeks earlier*[5]  -   one cannot make a case for the state of mind of a third party by invoking the word. Therefore, in light of Defendants' own words recited above, any misconduct engaged in by Plaintiff at the park was indubitably directed at the police officers, not the public.

This is crucial and wins this point: Defendants demonstrated no iota of evidence in support of the *mens rea* requirement in the Disorderly Conduct statute. The Court of Appeals has repeatedly limited the breadth of the Disorderly Conduct statute by enforcing that requirement, and the only cases that are ever allowed to go to trial, or that are upheld, adhere to this strict standard. "Disorderly conduct" as a phrase in the English language is so vague that the Court of Appeals has been dealing with it for a century. I now sit in a disorderly room: Sitting is conduct and my surroundings are the results of my actions. Am I committing disorderly conduct? No, significant case law, spawned by the vagueness of the title of statute, limits the ability to invoke it for any purpose (as was shown in this case where Krawieki couldn't even read her own written

---

[5]  This is a fact you must consider for this motion since it was agreed to, along with the judicial

reasons on the check box to support plaintiff's arrest). *See, e.g., People v. Baker*, 20 N.Y.3d 354, 359-60 (2013):

> As is clear from the precedent, critical to a charge of disorderly conduct is a finding that defendant's disruptive statements and behavior were of a public rather than an individual dimension. This requirement stems from the *mens rea* component, which requires proof of an intent to threaten public safety, peace or order (or the reckless creation of such a risk). Thus, "a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem[.]"

20 N.Y.3d at 360 (2013) (internal quotation marks and citation omitted).

Here, Defendants admitted they merely *assumed* that Plaintiff's actions alarmed other people, but showed no evidence that Uzoukwu that there was alarm, which is an inherently intent based conclusion that cannot be supported by the mere invocation of the word. "People in the park were alarmed because they was alarmed": That is what defendants contend amounts to probable cause, answering the question with the words in the question. There is no evidence that plaintiff intended to cause a riot or other public disturbance, which is a *mens rea* element of the charge that is required. Uzoukwu was admittedly upset by the Defendants' singling out of him for no reason (and expressed that by yelling at Defendants, according to their version), but Defendants also admitted that this happened <u>only after</u> Officer Krawiecki threw away his Jell-O. Plaintiff does not believe a reasonable juror could have found that his alleged actions, even as Defendants testified to them, amounted to anything beyond a Constitutionally protected response to questionable behavior by the police.

For example, there has never been any claim raised by any Defendant that Plaintiff directed threats or actually harmed anyone, even the Defendants themselves:

Q.   Well, he didn't resist arrest, did he?

19

A.   No.

Q.   He didn't harm you in any way, did he?

A.   No.

247:23-248:1.

Accordingly, Defendants cannot claim that they proffered anything more than their own self-serving *assumptions* about how the children and their caregivers reacted to the troublesome scene that was unfolding in the raised pavilion at Dutch Kills Park involving Plaintiff on May 15, 2008, not what actually happened because no one bothered to inquire or document the reactions of any of the alleged alarmed parents and children.

What happened between Plaintiff and Defendants in this case is not out of the ordinary, not withstanding the self-serving refrain to the contrary often repeated by Defendants throughout their self-serving testimony. The United States Supreme Court has weighed in on situations such as this, where the alleged criminal conduct is directed only at the police and motivated by protestations regarding questionable police conduct.   For example, in *Houston v. Hill*, the Court held that "[s]urely, one is not to be punished for nonprovocatively voicing [her] objection to what [she] obviously felt was a highly questionable detention by a police officer." 482 U.S. 451, 461 (1987); *accord Norwell v. Cincinnati*, 414 U.S. 14, 16 (1973) (*per curiam*) (arrest of individual for walking away from police officer, to protest his arrest, was an unconstitutional punishment of constitutionally protected speech).

This case does not involve a detention, but a highly questionable act of throwing away someone's food, prescribed by his doctor, and also his own property. Although Defendant Krawiecki testified that she could have arrested Plaintiff for engaging in conduct that is protected

by the Constitution, she is wrong as a matter of law. The facts of Plaintiff's case are on all fours with the cases discussed above decided by the highest court in New York and the United States. Other than the self-serving testimony of Defendants, there is no evidence that Uzoukwu engaged in the misconduct sufficient to make out probable cause for Disorderly Conduct.

What Plaintiff did was exercise his Constitutionally-protected right to protest mistreatment by the police, by remaining silent, which is protected conduct. *See Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003) ("Police officers must be more thick skinned than the ordinary citizen and must exercise restraint in dealing with the public. . . . It would be inherently unfair if an officer could rile up a crowd by mistreating a citizen in front of the crowd, and then could arrest that citizen for creating the disturbance.").

III. **There wasn't a shred of evidence that plaintiff obstructed anything, let alone government administration, unless you deprive him of his Fifth Amendment Right, which the Circuit held was improper.**

A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act.

Penal Law§ 195.05.

Under New York law, obstructing governmental administration has four elements:(1) prevention or attempt to prevent (2) a public servant from performing (3) an official function ( 4) by means of intimidation, force or interference. In addition, for an arrest to be "an official function," it must be lawful. *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010). "It is axiomatic that *only physical interference* [] is encompassed in the second method of obstruction. [] Thus, purely verbal interference may not satisfy the physical component under Penal Law §

195.05." *Uzoukwu v. City of New York*,  805 F.3d 409, 414 (2d Cir. 2015) (emphasis supplied); *People v. Case*, 42 N.Y.2d 98, 102 (1977) ("mere words alone do not constitute 'physical force or interference' such as to support the charge of obstructing governmental administration. . . . The statute against obstructing governmental administration requires as an element of the crime that the accused act by one of three methods: (1) intimidation, (2) physical force or interference, or (3) any independently unlawful act.")

Here, the Court provided the correct jury instruction on Obstruction of Governmental Administration. However, Defendants proffered to the jury not a shred of evidence that Plaintiff did anything resembling the misconduct required to make out a *prima face* case for their contention that there was probable cause to arrest for OGA. It is undisputed that Uzoukwu engaged in no physical conduct that in any way whatsoever interfered with the Defendants' questioning, search and subsequent arrest of Plaintiff. Instead, Defendant Krawiecki testified at trial that it was Plaintiff's failure to respond to her questioning that interfered with Defendants' ability to conduct an investigation into whether Uzoukwu was at the park without children:

> Q.     And your investigation was that you saw him sitting there looking down and eating jello with no diapers or strollers; correct?
>
> A.     Correct.
>
> Q.     And no further investigation led you to the conclusion that he was in violation of a park rule; correct?
>
> A.     No.  We asked him several times if he had children with him. He would not acknowledge us.
>
> Q.     But you agreed with me before that he has a right not to answer you. Correct?
>
> A.   *If he's violating a rule and he doesn't answer -- we're trying to investigate. We're asking him -- we're doing our investigation, asking him if he has children in the park. We get no response. He doesn't acknowledge us whatsoever.*

22

Q.      But he had the right not to acknowledge you; correct?

A.      Yes.

Q.      Your conclusion that he had no children in the entire environs of the playground was that he was, one, looking down; two, didn't have a stroller; and three, didn't have diapers. Correct?

A.      When we further investigated and asked him if he had children, he did not say that he did. He did not acknowledge us whatsoever. And there were no children near him.

Krawiecki, 240; 19-241;16 (emphasis added).

Defendants failed to demonstrate sufficient evidence to support their legal argument based on Plaintiff's alleged violation of the Obstruction of Governmental Administration statute as a matter of law and Uzoukwu should be granted a directed verdict for this reason.

## IV.      If there are questions of fact or law supporting some laws argued but not others, a new trial is required – including damages.

The defendant argued that a panoply of facts supported probable cause. We believe there were none, but what if the Court were to find probable cause to some but not others? Under the law of the case, the Circuit held that there was no inevitable arrest under any single argument proffered. Ipso facto, it ordered a new trial on everything, notwithstanding a bad instruction on OGA. The same is true here. There's no evidence of probable cause for violation of park rule or OGA. Nevertheless, assuming there were a scintilla of evidence that allow the police to arrest for disorderly conduct – and we contend there was not – the law of the case holds that an arrest on "discon" is not inevitable given the differing factual contentions. *Uzoukwu*, 805 F.3d at 418. The same is true if the Court finds some, but not all, of the alleged crimes had a question as to

23

whether there probable cause to arrest. If you were to so find, in keeping with the mandate, you should order a new trial, and it should be a plenary trial.

## V.     There are no facts in dispute that would allow the defense of qualified immunity.

The defendant has the burden of proof as to qualified immunity ("QI"). The defendants, however, provided you not a single question of fact that would allow you to find QI if you find in out favor on these legal issues. Originally, they proposed a list of subjective questions about "reasonable belief," all of which were not questions of fact as defined by the law of QI. *See generally Rucks v. City of N.Y.*, 96 F. Supp. 3d 138 (S.D.N.Y. 2015). The Court, to our surprise, seemed to shift the burden to plaintiff to come up with other questions. When we did not, as it is not our burden, the Court came up with some questions of fact, some of which were uncontested. Please do not be their advocate on their affirmative defense. They have identified not a single factual question that would help on the question of qualified immunity. Thus the defense should be stricken under any rule allowed at this stage, including Rule 12(c), 56, 59, 50, or whatever inherent authority the Court has to strike a defense, nor supported by an ounce of evidence. Even if the plausibility pleading rules do not apply to affirmative defenses, under *Rucks*, there is not a single fact in contention that would allow the Court to find QI as a matter of law.

## VI.    The Court has the discretion to order a new trial, in weight of the evidence.

Under Rule 59, the Court may order a new trial, even weighing the evidence. For all of the reasons stated above, were there any doubt about the conflicting evidence, given the stipulated evidence of neck surgery, the Court can weigh that fact against the defendant's contention that plaintiff did a dance around the bench area in the park shouting obscenities.

24

Three weeks after surgery? That just borders on verifiable perjury. You bifurcated over our objection and reduced the impact of doctor testimony on this subject. Nevertheless, there was a stipulation of recent surgery, plaintiff's mug shot shows a certain white line, and this was in dispute. So if there is no finding for plaintiff as a matter of law, as we believe there should be, you can consider these facts in granting a new trial. *Song v. Ives Labs., Inc*., 957 F.2d 1041, 1047 (2d Cir. 1992) ("[A] trial judge hearing a motion for a new trial 'is free to weigh the evidence [herself] and need not view it in the light most favorable to the verdict winner."

Two trials don't often result in reversal, *but see Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) (after three trials, reversal and remand for a fourth). On the record owe believe a myriad of issues are a basis for appeal, including (1) bifurcating, which prejudiced plaintiff's right to a full retrial under the mandate and limited the evidence of plaintiff's inability to engage in disorderly conduct; (2) the immigration evidence, when the case was about what defendant knew *at the time of the arrest*; (3) instructing the jury on proximate cause when causation was not at issue and damages were out of the picture. A bad instruction on the burden of proof is generally not harmless. Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). The Circuit reviews challenged jury instructions de novo "and will grant a new trial if we find an error that is not harmless." *Sanders v. New York City Human Res. Admin*., 361 F.3d 749,758 (2d Cir. 2004).

You also refused our instructions on the theory of the case under the First Amendment. See Point III. It is the law in every Circuit that a

> litigant is entitled to have the jury instructed as to his claims and theories of law if supported by the evidence and brought to the attention of the court. It does not matter that the evidence was minimal or was presented in a piecemeal fashion. All that is necessary is that there be some evidence supporting a party's theory of the case.

*Carvel Corp. v. Diversified Mgmt. Grp., Inc*., 930 F.2d 228, 230 (2d Cir. 1991) (citations omitted). Why would you not give us the instructions under the First Amendment? It was our theory of the case under disorderly conduct. In contrast, you instructed on proximate cause, increasing plaintiff's burden, where you had bifurcated damages evidence over our objection. We don't want to appeal but believe the Constitution must be gotten right.

We *could* go straight to appeal, but have spent this time making this motion because we don't want to jump to asking that you get reversed again. We think don't plaintiff received a fair trial, considering the jury instructions you didn't give us, the ones you did, and the evidence of probable cause – initially at least – amounting to no more than hunches. We believe that everyone, even a black, Nigerian immigrant who shops at a Big and Tall Man's Clothing place, and who doesn't speak perfect English, deserves the protections of the Constitution - including the right to remain silent, the right to tell the police "Fuck you, arrest me," and the right to be free from unconstitutional detention. This plaintiff's story is one of thousands upon thousands: The City has a check box form for a "dis-con" arrest, they are so repetitive. Mr. Uzuokwo is willing to stand up and take this further, but we believe in your heart you want to do good, as you told the <u>New York Times</u> when you went to Davis Polk from Justice, "as corny as that sounds." <u>See</u> Ronnie Abrams, Esq., quoted in "From Making the Cases to Challenging Them," <u>New York Times</u>, May 2, 2008.

## <u>CONCLUSION</u>

For these reasons, plaintiff's motion should be granted and the matter scheduled for a trial on damages. In the alternative, plaintiff should be granted a plenary trial, limiting it to such crimes that there was *any* evidence of probable cause. We believe there was none for any crime.

26

The suspicion of no children in the park had no back up except for plaintiff's refusal to answer, which is not probable cause. According to defendants, that's why this occurred. No, it's because the officers refused to move on and allow a man to assert his Fifth Amendment rights that this occurred. Few people are aware of this right or have the ability to assert it; same with the First Amendment to a cop. We won't stop making these argument based on bedrock principles of Constitutional Law until we are told to shut up and to forget about these measly "amendments."

Dated:      Jackson, Mississippi
            June 9, 2016


            _____/s/_____
            Gregory Antollino, Esq.


Dated:      Glendale, New York
            June 9, 2016


            _____/s/_____
            Daniela Nanau, Esq.

27